UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

KENNETH COLVIN, JR.,

        Plaintiff,

v.

HEIDI E. WASHINGTON et al.,

        Defendants.
_____/

Case No. 2:18-cv-150

Honorable Paul L. Maloney

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Washington, Horton, Batho, Lacrosse, Derry, Pawley, Sturm, Thompson, Corey-Spiker, McLean, McDonnell, Perry, Benson, Bawks, Radike, Olmstead, and Wallace.

## **Discussion**

    I.    <u>Factual Allegations</u>

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan.

The events about which he complains occurred at that facility. Plaintiff sues Defendants MDOC Director Heidi Washington, Warden Connie Horton, Resident Unit Manager Unknown Batho, Resident Unit Manager Unknown Lacrosse, Assistant Resident Unit Supervisor Unknown Derry, Lieutenant Unknown Burke, Sergeant Unknown Pawley, Sergeant Unknown Sturm, Prisoner Counselor Unknown Thompson, Classification Director Unknown Corey-Spiker, Grievance Coordinator Unknown McLean, Nurse Amy McDonnell, Sergeant Unknown Koskela, Sergeant Unknown Berghart, Prison Guards Unknown Perry, Unknown Benson, Unknown Bawks, Unknown Radike, Unknown Crisp, Unknown Olmstead, Unknown Russo, and MDOC Head of Policy Melody Wallace.

Plaintiff alleges that on March 22, 2017, Defendant Crisp wrote a false class II misconduct ticket on Plaintiff for insolence after Plaintiff stated that he was going to write a grievance on Defendant Crisp for improperly denying him his yard time. In the misconduct, Defendant Crisp falsely stated that Plaintiff had said "I'm going to write your ass up too."

On December 14, 2017, Plaintiff had a non-contact visit from his civil attorneys regarding a pending action. After the visit, Defendant Radike told Plaintiff that he needed to be strip searched. Plaintiff protested that he only needed to be patted down after a non-contact visit. Defendant Radike became angry and reported the situation to Defendant Pawley. Defendant Pawley told Plaintiff that he needed to attempt to resolve the matter with Defendant Radike before he filed a grievance. Defendants Radike and Pawley conducted the strip search on Plaintiff. Once the search was concluded, Defendant Pawley gave Plaintiff a misconduct ticket for disobeying a direct order for refusing the strip search. Plaintiff said that the ticket would be evidence for his grievance, and would be his ticket out of URF. Defendant Pawley immediately wrote a second ticket on Plaintiff for threatening behavior. Plaintiff claims both tickets are false.

On March 6, 2018, Plaintiff wrote a grievance on Defendant Perry for acting unprofessionally and improperly ordering Plaintiff from the kitchen when he attempted to report for

2

his work assignment. On March 13, 2018, Defendant Perry yelled at another prisoner, calling him by Plaintiff's name, and ordered him to leave his work assignment in the kitchen. On March 14, 2018, Defendant Perry wrote Plaintiff a class II misconduct ticket for being out of place, which accused Plaintiff of failing to report for his work assignment. Plaintiff received a hearing on the ticket on March 20, 2018, during which he explained that Defendant Perry had ordered him not to report for work, and that he had no way of knowing that he was supposed to report on March 14, 2018. Nonetheless, Plaintiff was found guilty and was removed from his work assignment. Plaintiff wrote a grievance on Defendant Perry for the improper misconduct ticket.

On March 15, 2018, Plaintiff wrote to Defendants Horton and Corey-Spiker regarding his lay-in from work. However, Defendants failed to interview him. Plaintiff claims that Defendants Perry and Corey-Spiker conspired to have him terminated from his job by violating his due process right to an interview prior to the termination. Plaintiff also claims that Defendant McLean improperly assigned his grievance to Defendant Sturm, who was not Defendant Corey-Spiker's supervisor. Plaintiff states that Defendant Sturm improperly investigated the matter by interviewing Defendant Perry instead of Defendant Corey-Spiker, because the real issue was that Plaintiff had not been interviewed prior to the termination. Finally, Plaintiff claims that pursuant to the URF kitchen's progressive discipline program, Plaintiff should not have been terminated after only one misconduct and without first being interviewed.

On April 2, 2018, Plaintiff wrote a grievance on Defendant Russo for falsely accusing Plaintiff of yelling during the review of a class II misconduct ticket. During the week of May 20, 2018, Plaintiff was moved from URF Eastside to URF Westside, after two misconduct reports were written on him by Defendant Pawley. On May 21, 2018, Defendant Russo gave Plaintiff a copy of the hearing report for a class II misconduct written on Plaintiff by Defendant Perry. Plaintiff asked Defendant Russo for an appeal form, and Defendant Russo asked Plaintiff why he was filing an appeal. Later that day, Defendant Russo called Plaintiff to the desk. When Plaintiff questioned why, Defendant Russo

3

yelled that Plaintiff should obey without asking questions. Defendant Russo then threatened to have Plaintiff placed in segregation and asked if Plaintiff was going to write a grievance on him. Plaintiff did write a grievance and placed it in the kitchen grievance box. On March 22, 2018, Plaintiff received a false class III misconduct from Defendant Russo for excessive noise. Plaintiff received a hearing on the misconduct by prison guard Gilbert [a non-Defendant], and was found guilty.

On May 29, 2018, Plaintiff overheard Defendant Koskela reviewing a misconduct on another prisoner beyond the 24 hour mandate. Plaintiff advised the prisoner of this issue after Defendant Koskela threatened the prisoner with additional days on LOP [loss of privileges] if he refused the three days toplock. Defendant Koskela told Plaintiff to be quiet before he had Plaintiff placed in segregation. Plaintiff told Defendant Koskela that he was going to write a grievance on him, and Defendant Koskela stated that he would see about that. Defendant Koskela then told the other prisoner that he was going to tear up the ticket, thanks to "his lawyer," referring to Plaintiff. Plaintiff filed a grievance.

On May 30, 2018, Defendant Berghart reviewed a misconduct with Plaintiff that had been written by Defendant Koskela. The misconduct accused Plaintiff of being disruptive while Defendant Koskela was reviewing a ticket with another prisoner. Plaintiff complained that he did not have to be reviewed on the ticket, and Defendant Berghart told Plaintiff to sit down, that he should have had enough of threatening staff with grievances. Plaintiff refused to give a statement and his refusal was witnessed by other prisoners. However, on May 30, 2018, Defendant Berghart wrote a false class II misconduct on Plaintiff for being loudly disruptive during the misconduct review process. Plaintiff filed a grievance regarding Defendant Berghart's false misconduct, claiming that it was in retaliation for Plaintiff asserting his right not to participate in the misconduct review.

On June 7, 2018, Defendant Burke conducted a hearing on two of Plaintiff's class II misconduct reports, which had been written by Defendants Koskela and Berghart. Defendant Burke told Plaintiff that he was finding him guilty because he did not approve of Plaintiff's grievance writing.

During the hearing, Defendant Burke refused to allow Plaintiff to obtain answers to questions posed to Defendants Koskela and Berghart, or to obtain requested video footage. Nor did Defendant Burke allow Plaintiff to present a detailed defense to the charges. Defendant Burke told Plaintiff that he did not have a right to a hearing investigator or to the evidence he was seeking. Plaintiff claims that the MDOC hearing process for class II and III misconducts is unconstitutional because it does not provide the same protections to prisoners as the hearing process for class I misconducts.

On June 21, 2018, at approximately 7:00 pm, Defendant Benson came to Plaintiff's cube with a duffel bag and told Plaintiff to pack up his property and take it to the property room. Plaintiff asked why, but Defendant Benson refused to reply. Once in the property room, Defendant Bawks took Plaintiff to his property, which consisted of three legal footlockers, one duffel bag, and one typewriter. Defendant Bawks refused to give Plaintiff a receipt for "prisoner personal property" or "contraband removal," or a "notice of intent to conduct an administrative hearing." When Plaintiff arrived back in his unit, Defendant Olmstead told him that he was now locking on the Eastside and to report to Defendant Burke in the control center. Plaintiff states that the Eastside of URF is more a restrictive unit than the Westside, although both are level II units.

When Plaintiff arrived at the Eastside control center, Defendant Burke told him that he had been sent there because of his grievance writing on Defendants Benson and Olmstead. Defendant Burke sent Plaintiff to get his property, where Defendant Bawks told him that he had also heard Plaintiff's move was the result of his grievance writing. Plaintiff filed a grievance that evening. Plaintiff received a response to his grievance on July 2, 2018, from Defendant Pawley, who stated that Plaintiff had been moved at the recommendation of unit and supervisory staff. The response further indicated that Defendant Burke denied telling Plaintiff that he had been moved because of his grievance writing. Plaintiff later discovered, after the return of two grievances he had written before his move to the Eastside, that Defendants Benson and Olmstead had been interviewed on the grievances just hours before Plaintiff was ordered to move.

5

On March 9, 2017, Plaintiff received a special accommodation, stating that he was at risk of heat-related illness. On June 30, 2018, Plaintiff wrote health care regarding the fact that he had been placed in a cell which had direct sunlight coming in the window for four hours each day, causing the cell to become extremely hot. Plaintiff was on sanctions and was required to remain in his closed cell, so Plaintiff was requesting a fan. Defendant McDonnell responded that health care did not provide fans, but that Plaintiff could purchase one, or that he could talk to his unit counselor. Plaintiff wrote to Defendant Derry, who found that Plaintiff had failed to prove that he needed the fan. Plaintiff wrote a grievance on the matter. Plaintiff also wrote to Defendants Horton, LaCrosse, and Batho, but they denied his requests for a fan:

> . . . URF surpassed acceptable standards during its most recent inspection to include standards for housing (ie: air flow, ventilation, noise levels, heating, lighting, living space, pest control, etc.) No policy violation was found to exist regarding this matter and no further action is warranted.

(ECF No. 1, PageID.29.) Plaintiff states that being confined in a hot cell caused him to suffer from headaches, nausea, and dizziness.

Plaintiff seeks compensatory, punitive and nominal damages. Plaintiff also seeks declaratory and injunctive relief.

II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff claims that the MDOC policy for adjudicating Class II and III misconducts is unconstitutional because it does not provide the same due process protections as the procedure for adjudicating Class I misconduct tickets. A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 486 (1995). Under Michigan Department of Corrections Policy Directive 03.03.105, ¶ B, a Class I misconduct is a "major" misconduct and Class II and III misconducts are "minor" misconducts. The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a Class I misconduct. (*See* Policy Directive 03.03.105, ¶ AAAA). The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical

and significant deprivations and therefore do not implicate due process. *See, e.g., Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999). Because the penalties imposed as a result of Class II and III misconduct convictions do not result in a loss of good time, they do not implicate the Due Process Clause. Therefore, Plaintiff's challenge to the MDOC policy on Class II and III misconducts, and his claims against Defendants Washington and Wallace for writing and instituting the policy, are properly dismissed for lack of merit.

Plaintiff also claims that Defendant Perry's conduct violated his due process rights and resulted in the loss of his kitchen job. In addition, Defendants Horton, Corey-Spiker, McLean, and Sturm violated Plaintiff's due process rights when they failed to properly address Plaintiff's grievance and complaints regarding the loss of his job. The Sixth Circuit has consistently found that prisoners have no constitutionally protected liberty interest in prison employment under the Fourteenth Amendment. *See, e.g.*, *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001) (district court properly dismissed as frivolous the plaintiff's claim that he was fired from his prison job); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (same). Morever, "as the Constitution and federal law do not create a property right for inmates in a job, they likewise do not create a property right to wages for work performed by inmates." *Carter*, 69 F. App'x at 680 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629-30 (3d Cir. 1989)). Under these authorities, Plaintiff fails to state a due process claim against Defendants Perry, Horton, Corey-Spiker, McLean, and Sturm arising from the termination of his prison employment.

Nor does Plaintiff have any due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer,* 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, the conduct of Defendants Horton, Corey-Spiker, McLean, and Sturm did not deprive him of due process.

Plaintiff claims that Defendants McDonnell, Horton, Batho, Lacrosse, and Derry violated his rights under the Eighth Amendment when they refused to provide him with a state-issued fan at no cost. Plaintiff asserts that this refusal occurred despite the fact that he had an accommodation stating that he was at risk for heat-related illness. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant

9

experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiff's claim that the denial of a fan was done with deliberate indifference to his health or safety is conclusory. As noted above, Plaintiff contacted health care on June 30, 2018, stating that his cell had direct sunlight coming in the window for four hours each day, that the cell became extremely hot, and that he had a special accommodation for being at risk of heat-related illness. Plaintiff states that he suffered from headaches, nausea, and dizziness after being confined in a closed hot cell while on sanctions. Plaintiff requested a fan. Defendant McDonnell responded that health care did not provide fans, but that Plaintiff could purchase one or ask his unit counselor.

Plaintiff's subsequent request to Defendant Derry was denied after Defendant Derry concluded that Plaintiff had failed to show that he needed a fan. Plaintiff filed a grievance, which was denied by Lacrosse, Batho, and Horton. In the Step I response, Defendant Lacrosse stated:

> Policy Directive 03.03.130 Humane Treatment and Living Conditions for Prisoners, paragraph B, "Living conditions in CFA facilities shall be consistent with ACA standards for Adult Correctional Facilities insofar as feasible. Prisoners in CFA facilities will be provided with the following: 1) Clean and orderly surroundings. 2) Sufficient number of toilets and washbasins. 3) Laundry and other facilities hygiene. 4) Lighting, ventilation, heating and noise levels that are adequate for comfort. 5) Non-housing areas maintained in a healthy and safe manner."
>
> Operating Procedure 03.04.100E Prevention of Heat Related Illnesses in Prisoners, Attachment A. states "Heat related illnesses can be avoided if common sense precautions are taken, such as the following: Stay out of the sun if possible. Wear light colored clothing whenever possible. When in cell, wear loose fitting clothing, e.g. gym shorts/tee shirts or athletic shirts. Drink 8-12 glasses of water a day. Splash water on

your body frequently and air dry. Sit rather than lie down, as more air will circulate around your body and you will be cooler. Restrict activities that require exertion, such as lifting weight[s], running or jogging, playing sports such as basketball. Avoid beverages that contain caffeine. Contact health care staff if you experience dizziness, muscle spasms, fainting, vomiting or nausea, change in appearance of the skin or confusion. When outside, wear a hat and light-weight clothing covering skin whenever possible. Being aware of the above information, taking common sense precautions and following recommendations should help you avoid any heat related illness.

URF surpassed acceptable standards during its most recent inspection to include standards for housing (i.e.: air flow ventilation, noise levels, heating, lighting, living space, pest control, etc.). No policy violation was found to exist regarding this matter and no further action is warranted.

(ECF No. 1-49, PageID.139.) The Step II respondent, Defendant Horton, found that Plaintiff was denied a fan in accordance with policy.

The Court notes that MDOC Policy Directive 04.07.110 ¶ F(9) (eff. 10/03/2016) provides that one portable 6 inch fan may be provided as approved by the MDOC for Level IV double bunked indigent prisoners who have documented heat-related illness. According to the allegations in Plaintiff's complaint, he is a level II prisoner. Plaintiff does not allege whether he employed other methods to keep from overheating, such as applying water to his body, increasing his water intake, and sitting rather than lying down. Nor does Plaintiff allege that he requested any medical intervention for dizziness, muscle spasms, fainting, vomiting or nausea, change in appearance of the skin or confusion following the denial of a fan, or that he advised any of the named Defendants of any of those symptoms. The record shows that Defendants acted in accordance with existing policy. Plaintiff has failed to allege facts showing that Defendants were aware of a serious medical need on Plaintiff's part, or that they were deliberately indifferent to any such need. Therefore, Plaintiff's Eighth Amendment claims against Defendants McDonnell, Horton, Batho, Lacrosse, and Derry are properly dismissed.

Plaintiff claims that he was moved from the Westside of URF to the Eastside of URF, which is a more restrictive level II than the Westside, although both are level II units. Plaintiff claims that the transfer was in retaliation for his grievance writing on Defendants Benson and Olmstead, and that Defendant Burke told him as much. Plaintiff attaches a copy of a step I grievance response by

Defendant Pawley, which states that Defendant Burke had been interviewed and had indicated that Plaintiff had been moved based on the recommendation of unit and supervisory staff.

In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Filing a grievance is constitutionally protected conduct under the First Amendment. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). Plaintiff, however, cannot show that his transfer from one URF level II unit to another URF level II unit was an adverse action taken against him from filing grievances against Defendants Benson and Olmstead. "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). *See, e.g., Smith v. Yarrow*, 78 F. App'x. 529, 543 (6th Cir. 2003) ("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted). If, however, a foreseeable consequence of a transfer would be to substantially inhibit a prisoner's ability to access the courts, then such a transfer could be considered an "adverse action" that would deter a person of ordinary firmness from continuing to engage in the protected conduct. *See Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (holding that transfer to administrative segregation or another prison's lock-down unit or can be sufficient to constitute adverse action); *Siggers-El*, 412 F.3d at 702 (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff

losing a high paying job that paid for his lawyer fees and moved him further from the attorney); *Johnson v. Beardslee*, No. 1:06-cv-374, 2007 WL 2302378, at *5 (W.D. Mich. Aug. 8, 2007). Similarly, the Sixth Circuit has held that a transfer to segregation or to an area of the prison used to house mentally disturbed inmates could be sufficiently adverse. *See Thaddeus-X*, 175 F.3d at 398; *see also Hill*, 630 F.3d at 468.

As noted above, Plaintiff was transferred from one level II unit to another. Although Plaintiff claims that the level II unit to which he was transferred was slightly more restrictive than the first unit, such a claim does not render the move sufficiently adverse to deter a person of ordinary firmness from engaging in protected conduct. Plaintiff fails to allege facts showing that the move cost him a job, prevented him from accessing the courts, or placed him with mentally disturbed inmates. Therefore, Plaintiff's claim of a retaliatory transfer against Defendants Burke, Benson, and Olmstead is properly dismissed.

Plaintiff claims that Defendants Radike and Pawley improperly strip searched him, but he does not allege facts showing that the search was motivated by a desire to retaliate against him for engaging in protected conduct. Therefore, Plaintiff fails to set forth a retaliation claim based on this conduct.

Plaintiff also appears to be claiming that the subsequent misconduct tickets were retaliatory. As noted above, Defendant Pawley gave Plaintiff a misconduct ticket for disobeying a direct order for refusing the strip search. After Plaintiff said that the ticket would be evidence for his grievance, Defendant Pawley wrote a second ticket on Plaintiff for threatening behavior. Plaintiff was found guilty of the class I misconduct of disobeying a direct order on December 19, 2017, during which Plaintiff asserted that he was not on a visit, but a call, so he should not be searched. In the reasons for finding, Hearing Officer O'Brien stated:

> Officer Radtke gave a direct and reasonable order to Prisoner Colvin to step into the room for a strip search on 12-14-17 at 1700 hours. Prisoner Colvin heard and understood the order because it was a clear order given directly to him. Prisoner Colvin

13

per his own statement did not comply with a strip search at this time. The order was capable of being performed, did not pose a significant risk of substantial harm and did not conflict with a prior order. Prisoner Colvin's statement that he was not given the order is not believed because if that was true he would have said it in his written statement. Second, per his written statement he did not comply as he walked out of the room and sat down when the officer yelled at him which is willingly not complying with the strip search as he should have stayed in the room and allowed the strip search if he wanted to comply. It is not a defense that he felt he should not be strip searched because he still has to comply and he can grieve it. I find that the witnesses requested are not relevant as per his written statement he did not comply when the order was given. Finally even if Pawley typed the report Radtke was there the entire time and read and signed it so it was his report and who typed it is not relevant. The Officer is clear and factual in his statement and is found to be credible.

(ECF No. 1-42, PageID.119.) A prisoner's claim that he was falsely accused of a major misconduct is barred where there has been a finding of guilt. *See Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013) (holding that a factual finding in a major misconduct proceeding has preclusive effect and is not subject to challenge in a § 1983 action). However, as the Sixth Circuit subsequently qualified in *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), not every factual finding is entitled to preclusive effect. Instead,

> the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. [*Peterson*, 714 F.3d] at 916-17. It likewise turns on the court's "sense of justice and equity," *Blonder-Tongue Labs., v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971), which may require a case-by-case analysis of surrounding circumstances.

*Roberson*, 770 F.3d at 404-05.

In *Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018), the Sixth Circuit further clarified the limitations of the preclusion doctrine, as follows:

> To determine whether we must give preclusive effect to "factfinding from Michigan prison hearings," we look to four requirements, all of which must be met: (1) the state agency "act[ed] in a 'judicial capacity'"; (2) the hearing officer "resolved a disputed issue of fact that was properly before it"; (3) the prisoner "had an adequate opportunity to litigate the factual dispute"; and, (4) if these other three requirements are met, we must "give the agency's finding of fact the same preclusive effect it would be given in state courts." *Peterson v. Johnson*, 714 F.3d 905, 911–13 (6th Cir. 2013) (internal citation and quotation marks omitted).

In *Peterson*, the Court considered, as a matter of first impression, whether a hearing officer's factual determination at a Michigan *major* misconduct hearing has preclusive effect in litigation brought by a prisoner under § 1983. *Id*. at 908, 911. The Court concluded that, because all four requirements were met, the "hearing officer's *factual* finding that [the prisoner] was the one who grabbed [the officer's] hand precludes a contrary finding in federal court." *Id*. at 917. In *Roberson v. Torres*, the Court considered the same issue, and identified the four requirements listed above. 770 F.3d 398, 403-04 (6th Cir. 2014). The Court said that *Peterson* does not mean that "any factual findings by a hearing officer in a major-misconduct hearing in a Michigan prison are to be accorded preclusive effect." *Id*. at 404. "*Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing." *Id*.

> Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. It likewise turns on the court's sense of justice and equity, which may require a case-by-case analysis of surrounding circumstances.

*Id*. at 404-05 (internal citations and quotation marks omitted). The Court declined to decide the preclusion question, and remanded the case to the district court to consider the argument for the first time. *Id*. at 405. The Court instructed the district court to "give particular attention to the fairness and accuracy of the factual findings made by the major-misconduct hearing officer." *Id*. The Court advised that "[n]umerous inquiries may be relevant to the district court's analysis," like "why the hearing officer refused to review the alleged video of the incident, whether the hearing officer provided a sufficient and reasonable basis for her factual findings, and whether the testimony of other witnesses corroborated the accounts provided by either [the prisoner] or [the officer]." *Id*. at 405.

*Maben*, 887 F. 3d at 259. The *Maben* court expressly rejected the application of *Peterson/ Roberson* preclusion to minor misconduct proceedings in Michigan, both because the state agency was not acting in a judicial capacity and because the prisoner in such proceedings does not have an adequate opportunity to litigate the factual dispute. *Id.* at 261.

It is clear from the attachments to Plaintiff's complaint that the December 14, 2017, misconduct ticket for disobeying a direct order concerned a class I misconduct. The hearing officer determined that Plaintiff was actually guilty of disobeying a direct order. Plaintiff does not have a protected right to disobey a direct order. Therefore, pursuant to *Peterson*, Plaintiff is barred from asserting a retaliation claim with regard to the disobeying a direct order misconduct.

15

It is also clear that the December 14, 2017, misconduct for threatening behavior was a class I misconduct. (ECF No. 1-43, PageID.126.) During the hearing on the misconduct, Hearing Officer O'Brien gave the reasons for finding:

> Prisoner Colvin said to [Sergeant] Pawley "I'm having a hard time not putting my hands on you right now so you better just let me leave before I do something I'm gonna regret." I find that this statement by its very nature expresses an intent to physically harm Sergeant Pawley. Prisoner Colvin's questions for the [Sergeant] are not necessary as [Sergeant] Pawley gives hi[s] version of what was said in the ticket and asking him [stet] if it was a lie and shows him talking to the officer but does not pick up audio and they both admit he was talking. Prisoner Colvin's statement is not believed because he never states clearly what he said at the very end right before he was cuffed up which was when this remark [w]as alleged to have been made and he only summarizes what he was saying unlike the direct quotes he gave for everything else and if he truly had not threatened the Sergeant he would have known and given an exact quote of what he said for this instead of saying something like he was giving it to his attorneys. The Sergeant is clear and factual in his statement and is found to be credible.

*Id.*

Based on the evidence presented during the hearing, the Hearing Officer determined that Plaintiff had threatened Defendant Pawley. Plaintiff does not have a protected right to behave in a threatening manner. Therefore, pursuant to *Peterson*, Plaintiff is barred from asserting a retaliation claim with regard to the threatening behavior misconduct.

Plaintiff names Unknown Bawks as a Defendant, but the only allegations against Defendant Bawks are that he told Plaintiff the transfer to the Eastside of URF was retaliatory. In addition, Plaintiff fails to make any specific allegations of wrongdoing against Defendant Thompson. Conclusory assertions of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Therefore, Defendants Bawks and Thompson are properly dismissed.

Finally, the Court notes that Plaintiff's retaliation claims against Defendants Russo, Burke, Koskela, Berghart, and Crisp are not clearly frivolous and may not be dismissed on initial review.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Washington, Horton, Batho, Lacrosse, Derry, Pawley, Sturm, Thompson, Corey-Spiker, McLean, McDonnell, Perry, Benson, Bawks, Radike, Olmstead, and Wallace will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's retaliation claims against Defendants Russo, Burke, Koskela, Berghart, and Crisp remain in the case.

An order consistent with this opinion will be entered.

Dated: February 11, 2019 /s/ Paul L. Maloney
Paul L. Maloney
United States District Judge